# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Christopher Ivey,                           Case No. 12-cv-30 (DWF/TNL)

                    Plaintiff,

v.                                          **REPORT AND
                                            RECOMMENDATION**

MSOP, Daniel Williams,                      **\*FILED UNDER SEAL\***
Michael Glavan, Steven Sayovitz,
William Gullickson, Scott Giannini, Tara
Halverson, Kevin Dreher, and Matthew
Dahl,

                    Defendants.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Plaintiff's Partial Motion for Summary Judgment (ECF No. 160) and Defendants' Motion for Summary Judgment. (ECF No. 167). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. (ECF No. 22). Based on all the files, records, and proceedings herein, and for the reasons set forth below, this Court recommends that Plaintiff's motion be **GRANTED IN PART and DENIED IN PART** and Defendants' motion be **GRANTED.**

## I.    PROCEDURAL HISTORY

On January 5, 2012, Plaintiff Christopher Ivey filed a complaint against the Minnesota Sex Offender Program ("MSOP") and several employees. (ECF No. 1). Ivey

alleges that his civil rights were violated following an incident in his room in November 2011. Following dispositive motion practice, the matter was reduced to the following claims: excessive force claims against Defendants Daniel Williams, Michael Glavan, William Gullickson, Scott Giannini, Tara Halverson and Matthew Dahl; a battery claim against Glavan; and Fourth Amendment claims against Defendants Kevin Dreher, Dahl, and Gullickson. Defendants answered the complaint and moved for summary judgment on January 6, 2020. (ECF No. 167). Ivey moved for partial summary judgment on January 3, 2020. (ECF No. 160).

## II.     MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Under Rule 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586–87 (1986)). In considering such a motion, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotation and citation omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *Torgerson*, 643 F.2d at 1043.

With one exception, Ivey's claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. The "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### B. Facts

Ivey has been civilly committed to MSOP where, during the time period relevant to this matter, he resided in the Omega Unit. (ECF No. 172, Tr. 17:9-17:11). Sometime in November 2011, a patient in his unit was transferred to the High Security Area ("HSA") for failing to comply with MSOP rules. (Tr. 62:10-63:13). This made Ivey upset and he

decided to develop a plan to "shut down the facility for an hour or two[.]" (Tr. 64:3-64:9). Ivey told other patients that if they decided to not stand up for MSOP's daily count of patients, he would "tear [his] room up." (Tr. 64:3-64:14).

Ivey had previously detached a metal stool that was bolted to the floor of his room. (Tr. 64:11-64:17).  On the afternoon of November 17, 2011, when multiple MSOP patients decided not to stand up for count, MSOP initiated an incident command system. (Tr. 66:4-68:11). Around the same time, Ivey put staples in his door's locks. (Tr. 64:21-65:4). He covered the window of his door and barricaded it with his mattress. (Tr. 73:15-73:21). Ivey also prepared a hat, a towel and water to protect him any chemical irritant that MSOP staff might use against him. (Tr. 81:12-82:18).

Ivey then began to use the stool to destroy his room. (Tr. 70:14-7:17). Among other things, he hit the window of his room more than 100 times, causing shards to fall. (Tr. 70:18-70:20; 84:10-84:20). Ivey also struck his toilet and sink. (Tr. 70:14-70:17).

MSOP staff asked Ivey to stop multiple times. (Tr. 77:11-77:16; 78:1-78:12). Ivey refused, even when staff threatened to use chemical irritant against him. (ECF No. 183, p. 4). A MSOP A-Team, a group whose job is to respond to incident command systems and maintain safety, responded. (ECF No. 183, p. 2). Williams, a member of that team, attempted to deploy chemical irritant in the room, but could not because the door was blocked by Ivey's mattress. (ECF No. 183, p. 2). Eventually, the door was cracked open and Williams was able to deploy irritant. (ECF No. 183, p. 2).

Ivey laid down on his bed and placed his hands behind his back. (Tr. 88:4-88:16). Four members of the A-Team entered the room. One member, Kevin Carlson, placed a

shield on Ivey's back and arms. (ECF No. 183, p. 2). Glavan was responsible for securing Ivey's right arm, while another team member was responsible for securing the left. (ECF No. 183, p. 2). To secure Ivey, Glavan reached underneath the shield and pulled Ivey's arm out while bending it at the wrist and applying pressure to the hand and elbow. (Tr. 91:16-92:6; ECF No. 116). Williams then secured Ivey's lower body and handcuffed him with his hands behind his back. (ECF No. 183, p. 2). Ivey's wrists were pulled very close together and his palms were facing away from each other. (ECF No. 1-4, p. 23). The handcuffs were applied tightly enough to cause gouges in Ivey's wrists. (Tr. 128:17-18).

The A-Team prepared to transport Ivey to the HSA. Because Ivey would not walk there, staff called a stretcher for him and rolled him on his side so that he could breathe. (ECF No. 12, at 3:48). A few minutes later, MSOP nurse Andy Kvien asked Ivey if he was injured. (ECF No. 12, at 5:35). Ivey indicated his thumbs hurt and that there was some sensitivity in his nose. (Tr. 100:8-101:20). Eventually, Stylski and Halverson transferred Ivey to the HSA. (ECF No. 12, at 6:50).

It is MSOP policy that all patients entering the HSA undergo an unclothed visual body search ("UVBS"). (ECF Nos. 164 & 181). At the time of the incident, it was also MSOP policy that restraints not be removed from a patient until the patient complies with the UVBS. (ECF Nos. 181 & 181-1, pp. 5-7). As a result, MSOP staff would leave a patient in restraints for up to four hours if a patient did not comply with the UVBS. (ECF No. 163-2, p. 5). It appears this policy has since been amended so that a patient may only spend one hour in restraints. (*Id*.).

5

Ivey indicated he would not comply with the UVBS several times. (ECF No. 12, at 7:50, 12:20). Halverson, Dreher, and Dahl began to pat search Ivey. (ECF No. 12, at 13:09). Ultimately, Ivey was placed in Room 102 of the HSA at 5:52 p.m. (ECF No. 115-1, p. 29). Nearly 40 minutes later, staff asked Ivey if he would comply with the UVBS. (ECF No. 115-1, p. 30). Ivey declined. (ECF No. 115, p. 30).

Shortly thereafter, another incident command system was initiated because Ivey had begun to hit his door and wall. (ECF No. 183, p. 13). Staff asked Ivey if he needed medical attention. (ECF No. 183, p. 13). Though Ivey indicated he did not, Kvien examined him anyway, locating abrasions on his hands. (ECF No. 183, p. 19). Ivey said he was uninjured, but would let staff know of any pain. (ECF No. 115-1, p. 30). Ivey again refused to comply with the UVBS. (ECF No. 183, p. 15). At some point, Ivey removed his pants and underwear, grabbed his genitals, and bent over toward Dahl. (Tr. 111:20-112:21).

At approximately 7:20 p.m., Ivey notified Complex Control that his hands hurt. (ECF No. 115-1, p. 31). About 10 minutes later, Halverson visited Ivey, who told her that his restraints were too tight. (ECF No. 115-1, p. 26). Halverson asked Ivey if he would consent to the UVBS so they could be removed. (*Id.*). Ivey refused. (*Id.*). Shortly before 8:00 p.m., Ivey told staff that his handcuffs were on too tightly. (ECF No. 115-1, p. 21). A few minutes later, Gullickson and other MSOP staff visited Ivey, who then consented to the UVBS, saying that his hands hurt because the handcuffs "were placed on too tight." (ECF Nos. 115-1, p. 19). Staff then wrapped Ivey in a blanket and moved him to Room N104, which faces toward, and is a short distance from, MSOP Living Unit 1E. (ECF No. 164, p. 9, 11). The windows in Room N104 were uncovered. (ECF No. 163, p. 1).

Dreher and Dahl removed Ivey's handcuffs and conducted the UVBS. (ECF No. 183, p. 13). They required Ivey to completely undress, stood very close to him, visually inspected his mouth and arms, and required Ivey to lift his genitals and spread his buttocks. buttocks. (ECF Nos. 116, p. 11 and 128, p. 10). They did not locate any contraband on him. (ECF No. 164, pp. 9-11).

Following the incident, Ivey suffered some numbness, which lasted a short period of time. (Tr. 147:2-148:11; 148:15-148:17). He continues to suffer a tingling sensation when he performs "lots of intensive finger movements," like using a mouse or keyboard. (Tr. 147:2-148:11; 148:15-148:17). A physical examination completed one month after the incident found that Ivey had no swelling or discoloration in his wrists; that his wrist and grip strength were good; and that Ivey did not complain of pain. (ECF No. 115-1, p. 47).

Ivey also sought treatment for shoulder pain in 2015. The treating physician reported that Ivey complained of "intermittent right shoulder pain" that occurred "only with certain" physical exercises. (ECF No. 115-1, p. 51). The treating provider concluded that Ivey's pain resulted from "a mild instability type program with symptoms only produced by extreme positions and activities." (*Id*.). It does not appear Ivey mentioned the November 2011 incident when he saw the physician.

### C. Count Three – Excessive Force as to Williams

The parties agree this count, which alleged that Williams used excessive force by placing Ivey in hinged handcuffs, should be dismissed because the record establishes that hinged handcuffs were not used on Ivey. The Court therefore recommends that this count be dismissed.

### D. Counts One, Two, and Six – Excessive Force as to Williams, Gullickson, Gianni, Halverson, and Dahl

Ivey also alleges that Williams used excessive force by handcuffing him in what Ivey refers to as a "chicken wing" position and by placing the handcuffs on him too tightly. He further alleges that Gullickson, Gianni, Halverson, and Dahl used excessive force by keeping Ivey handcuffed behind his back while ignoring his requests for help.

"The Constitution, itself, makes no specific reference to 'excessive force.'" *Martin v. Benson*, 2010 WL 2925116 *6, No. 09-195 (D. Minn. June 14, 2010), *report and recommendation adopted by* 2010 WL 2925104 (D. Minn. July 21, 2010), *aff'd* 407 Fed. Appx. 986 (8th Cir. 2011) (per curiam). "However, it is well established that the Constitution prohibits governmental authorities from using excessive force against individuals who are being held in custody." *Id.* For pre-trial detainees, this prohibition arises under the Fourteenth Amendment's Due Process Clause. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). Claims raised by civilly committed individuals for excessive force are treated the same as pre-trial detainee claims. *Martin*, 2010 WL 2925116 at *6.

To bring a claim for excessive force claim under 42 U.S.C. § 1983, "[a] pretrial detainee must show . . . that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness test "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer

on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. In applying this standard, the Court considers the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. The Court "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citation and internal quotations omitted).

When an excessive force claim is based on the use of handcuffs, the plaintiff must also establish that he or she suffered more than a *de minimis* injury. *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011). This is because handcuffing "almost inevitably will result in some irritation, minor injury, or discomfort[.]" *Id*. Thus, in cases like these, where a plaintiff alleges that officials applied handcuffs too tightly and then ignored the plaintiff's complaints of pain, there must be some proof, usually in the way of medical records, showing the plaintiff suffered long-term injury as a result of the handcuffing. *Powel v. Staycoff*, No. 17-cv-3018, 2019 WL 2524771, at *8 (D. Minn. June 19, 2019) (citing *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003)); *see also Stepnes v. Ritschel*, 663 F.3d 952, 961 (8th Cir. 2011) (requiring proof "beyond minor injuries" due to the handcuffing); *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (granting summary judgment where plaintiff complained to officer that handcuffs

were too tight because the only injury the plaintiff suffered was "red marks that were visible for days afterward").

Applying this standard to the record here, the Court recommends that Ivey's claims of excessive force against Williams, Gullickson, Gianni, Halverson, and Dahl be dismissed. There is nothing to suggest that Ivey suffered more than minor injuries from the handcuffs. Taking the record in the light most favorable to Ivey, he has established only that he suffered some numbness following the incident, which did not last long, and that he continues to suffer a tingling sensation when doing "lots of intensive finger movements." (Tr. 147:2-148:11; 148:15-148:17). Injuries like these are insufficient to give rise to a cause of action for excessive force related to handcuffing. *Stepnes*, 663 F.3d at 961 (dismissing bruising, soreness, and numbness as injuries insufficient to give rise to excessive force claim related to handcuffing); *Poindexter v. Harper*, 11-cv-4115, 2013 WL 791314, at *4 (W.D. Ark. Feb. 12, 2013) (rejecting injuries of tingling and numbness because they are the type "inherent in handcuffing"), *report and recommendation adopted by* 2013 WL 791439 (W.D. Ark. Mar. 4, 2013). A physical examination completed one month after the incident found that Ivey had no swelling or discoloration in his wrists; that his wrist and grip strength were good, and that Ivey did not complain of pain. (ECF No. 115-1, p. 47). Because the record shows that Ivey suffered nothing more than minor injuries from the handcuffing, his excessive force claims as to Williams, Gullickson, Gianni, Halverson, and Dahl fail. The Court recommends that counts one, two, and six be dismissed.

### E.  Count Four – Excessive Force as to Glavan

In count four, Ivey alleges that Glavan used excessive force on him by using a "rear wrist lock" to place Ivey's arm behind his back before handcuffs were applied. The same "objectively unreasonable" standard that applied to Ivey's claims against Williams, Gullickson, Gianni, Halverson, and Dahl also applies here. *See Kingsley*, 135 S. Ct. at 2473.

Like the other Defendants to Ivey's excessive force claims, Glavan argues summary judgment is appropriate because Ivey failed to demonstrate more than a minor injury from Glavan's actions. But for that argument to have any merit, the Court must conclude that Glavan's actions were inherent to the process of handcuffing. *See Stepnes*, 663 F.3d at 961 (requiring more than minor injury for excessive force claims *related to handcuffing*). If Glavan's actions were not, then Ivey would need only show that the record establishes that he suffered a *de minimis* injury in order to survive summary judgment on this argument. *See Chambers*, 641 F.3d at 907.

In his deposition, Ivey indicated that MSOP's A-team entered the room and placed the shield on his back and his hands. (Tr. 88:15-88:16). He then stated that Glavan reached underneath the shield and pulled his arm out while applying pressure to his hand and elbow. (Tr. 91:16-92:6). In general, the process of handcuffing includes the steps necessary for that officials to place a detainee's hands behind his or her back so that restraints can be applied. *See Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) ("Handcuffing inevitably involves some use of force. When Wertish persisted in lying on his hands, it was reasonable to pull them forcibly behind his back, where they could be cuffed."). In this

case, Ivey's arm was pinned behind the shield, and it was necessary for Glavan to remove it so that handcuffs could be applied. As a result, the method by which Glavan accomplished this was inherent to the process of handcuffing. *See Wertish*, 433. F.3d at 1067. Ivey must therefore show more than minor injury for this claim to survive summary judgment. *See Stepnes*, 663 F.3d at 961.

Ivey has failed to do so. Ivey did not complain of shoulder pain during or immediately after the incident. In fact, the only time he sought treatment for shoulder pain occurred in 2015, four years after the incident. Nothing in the notes from that session suggest that Ivey mentioned the November 2011 incident. The treating physician reported that Ivey experienced "intermittent right shoulder pain" only when performing certain physical exercises. The treating provider concluded the condition "was really a mild instability type program with symptoms only produced by extreme positions and activities." (ECF No. 115-1, p. 51). On this record, taking the facts most favorable to Ivey, the Court concludes he has failed to establish the type of injury necessary for an excessive force claim related to handcuffing to prevail.

Furthermore, even if the injury were more than minor, there is nothing in the record that links Ivey's injury to Glavan's actions. As the Court previously noted, Ivey did not mention the November 2011 incident as a potential cause for his pain when he sought treatment in 2015. In fact, Ivey admitted in his deposition that he had suffered rotator cuff pain since he was a child and that Glavan's actions, at most, exacerbated a pre-existing condition. (Tr. 153:5-153:12). But when a plaintiff has a history of injuries and then claims the use of excessive force exacerbated those injuries, the plaintiff must be able to provide

proof of causation by way of expert testimony. *See Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (requiring proof of causation for sophisticated injuries); *see also Saunders v. Frost*, 124 Fed. App'x 468, 469 (8th Cir. 2005) (affirming summary judgment in excessive force claim where plaintiff had extensive history of knee injuries because nothing in record connected alleged new injury to the defendants' actions). Ivey has not done so here. He has not offered any expert testimony or identified any other medical records that would connect the exacerbation of his injury to Glavan's actions. Summary judgment is appropriate for this reason as well.

### F.  Count Five – Battery as to Glavan

Ivey also contends that Glavan's conduct constitutes the tort of battery under Minnesota law. A claim of battery is defined as an intentional, unpermitted, offensive conduct with another. *Paradise City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

Summary judgement is appropriate on this claim because Glavan is entitled to official immunity for his actions. The doctrine of official immunity "shields a public official from liability if he is charged by law with duties which call for the exercise of his judgment or discretion." *Grady v. Becker*, 907 F. Supp. 2d 975, 985 (D. Minn. 2012) (citation and internal quotations omitted). The arrest and handcuffing of an individual are typically considered discretionary acts that are protected by this doctrine. *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990). Official immunity does not apply, however, if the conduct complained of was performed willfully or maliciously. *Grady*, 907 F. Supp. 2d at 985. "In the context of official immunity, willful and malicious are synonymous, as malice means nothing more than the intentional doing of a wrongful act without legal

justification or excuse, or, otherwise stated, the willful violation of a known right." *Id.* (citations and internal quotations omitted).

"Whether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by the jury." *Johnson*, 453 N.W.2d at 42. In this case, however, Ivey has admitted that he has no evidence to show that Glavan acted maliciously. (Tr. 199:15- 200:13). Instead, Ivey claims that a fact dispute as to his excessive force claim against Glavan precludes application of the official immunity doctrine. Because the Court granted summary judgment on Ivey's excessive force claim against Glavan, Ivey cannot argue that claim precludes application of the official immunity doctrine. Summary judgment is therefore appropriate as to Ivey's battery claim.

### G. Count Eight – Fourth Amendment Claim as to Dreher and Dahl

The Court will next consider Ivey's claim that Dreher and Dahl violated his Fourth Amendment right to be free from unreasonable search and seizures. Both parties seek summary judgment on this claim.

"[I]nvoluntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) (citing *Serna v. Goodno*, 567 F.3d 944, at 948-49 (8th Cir. 2009)). "Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner." *Beaulieu*, 690 F.3d at 1028 (quoting *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004)).

Ivey's claim also "turns in part on the extent to which this [c]ourt has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue." *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 566 U.S. 318, 322 (2012). "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security." *Id.* at 322-23.

To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979). Four factors are relevant to determining whether the UVBS was reasonable: "(1) the justification for initiating the search, (2) the scope of the particular intrusion, (3) the place in which the search is conducted, and (4) the manner in which it is conducted." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 572 (8th Cir. 2009). The Court will consider each factor in turn.

The first factor, justification for the search, weighs in favor of Dreher and Dahl. MSOP policy required that officials conduct a UVBS immediately upon transferring Ivey to the HSA. (ECF No. 181-1, p. 4). This alone justifies the search. "MSOP has legitimate concerns in conducting an [UVBS] when an individual at MSOP enters a new area[.]" *Green v. Lake*, No. 14-cv-1056, 2019 WL 2016781, at *7 (D. Minn. Jan. 30, 2019), *report and recommendation adopted as modified*, No. 14-cv-1056, 2019 WL 1324851 (D. Minn. Mar. 25, 2019), *aff'd*, 793 F. App'x 467 (8th Cir. 2020); *see also Larson v. Jesson*, No. 11-

cv-2247, 2018 WL 3352926, at *4 (D. Minn. July 9, 2018). This is because "MSOP is promoting the security of its facility by ensuring that individuals are not concealing drugs or weapons when leaving and entering new areas of the facility." *Green*, 2019 WL 2016781, at *7; (*see also* ECF No. 181-1, p. 2).

Ivey contends that transfer to HSA alone cannot justify the search, arguing that the UVBS could be waived in certain circumstances. He notes that staff could have mitigated the risk that he was in possession of contraband or other dangerous items, by using a less intrusive metal detector to conduct the search or by asking him about the bolts before moving him to the HSA. He further notes MSOP staff had no reason to believe he was armed or otherwise in possession of contraband.

Ivey's argument is not persuasive. Courts in this district have held that transfer to the HSA alone provides ample justification for the UVBS. *See Green*, 2019 WL 2016781, at *7; *Larson*, 2018 WL 3352926, at *4. The Court agrees with those decisions. Moreover, there is no evidence in the record to suggest that Dreher or Dahl had the authority to waive the UVBS. The undisputed evidence in the record shows only MSOP's executive director could waive the search, and that person is not named as a defendant in this lawsuit. (ECF No. 175, p. 3); *see also Olivier v. Willers*, No. 13-cv-266, 2016 WL 1275032, at *8 (D. Minn. Mar. 31, 2016) (explaining that defendants cannot be held liable for constitutional violations for which they are not the perpetrators). Thus, to the extent Ivey argues there was not ample justification for his search because MSOP staff had the option to waive it, Dreher and Dahl cannot be held liable for that waiver.

The next factor the Court considers is the scope of the intrusion. A UVBS is "intrusive and unpleasant." *Serna*, 567 F.3d at 954 (citation omitted). As the Court described above, Dreher and Dahl conducted the UVBS by standing close to Ivey while he was completely unclothed; visually inspecting his mouth and arms; and ordering Ivey to lift his genitals and spread his buttocks. (ECF Nos. 116, p. 11 and 128, p. 10). The close range at which they conducted the UVBS further adds to the invasiveness of the search. *See Florence*, 566 U.S. at 325 (explaining that visual inspection from five feet away or less is "uncomfortable").

The intrusion was, however, similar to an intrusion approved of by the Eighth Circuit in *Serna*. Like this case, the defendants in *Serna* "visually inspect[ed] the patients' bodies," and "instructed each patient to turn, bend over slightly, and spread his buttocks." *Serna*, 567 F.3d at 947. The Eighth Circuit, while noting the search was "intrusive," explained that it was "not any more intrusive or demeaning than" the search approved by the Supreme Court in *Bell* and affirmed the grant of summary judgment in favor of the defendants. *Id.* at 954 (citation omitted). Because the search at issue here is no more intrusive than that conducted in *Serna*, this factor weighs in favor of Dreher and Dahl.

In fact, if anything, the search conducted here was less intrusive then *Serna* because Ivey had already removed his pants and underwear and showed his genitals and buttocks to MSOP staff. (Tr. 112:7-112:25). The Fourth Amendment does not protect that which is "knowingly expose[d] to the public." *Katz v. United States*, 389 U.S. 347, 351 (1967). Ivey himself admits that he "waiv[ed] his privacy" by acting the way that he did. (Tr. 113:7-113:8).

Of course, Ivey's actions do not mean that he lost all expectation of privacy. As Ivey notes, when he first took off his pants and underwear, he was wearing a loose t-shirt, which largely covered his genitals and buttocks (ECF No. 116, p. 6-7). He also was not standing near Dreher and Dahl when he took off his clothes. The UVBS involved more intrusive measures; it required Dreher and Dahl to stand close to Ivey; forced Ivey to remove the remainder of his clothes; and required Ivey to manipulate his genitals and buttocks in ways that he had not done previously. But because this factor already weighed in favor of Dreher and Dahl, the fact that Ivey had a reduced expectation of privacy at the time of the search further emphasizes that the scope of intrusion was substantially less than what the Eighth Circuit has already found reasonable. *See Serna*, 567 F.3d at 954.

The next factor the Court must consider is the location of the search. This is a "critical" factor in determining whether the UVBS was reasonable. *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981). The search took place in Room N104, which faces MSOP Living Unit 1E. (ECF No. 164, p. 9-11). The windows in the room where Ivey was searched were uncovered. (*Id.*). Neither party suggests that another MSOP patient saw the search occur.

The parties dispute, however, whether it was possible for another patient to see into Room N104. If genuine, this dispute would be significant. It is well established that strip searches conducted in public view raise substantial constitutional concerns. *Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1008 (8th Cir. 2007); *Campbell v. Miller,* 499 F.3d 711, 718 (7th Cir. 2007) ("Courts across the country are uniform in their condemnation of

intrusive searches performed in public"). This is true regardless of whether anybody witnessed the search. *Logan*, 660 F.2d at 1014.

The record does not, however, establish a "genuine" dispute of material fact as to this issue. *See Celotex Corp.*, 477 U.S. at 323. An investigation following an incident in 2019 found that though it was possible for MSOP patients to see into certain HSA rooms from Living Unit 1E, it was not possible to see into Room N104. (ECF No. 163-2, p. 15). In addition, another MSOP patient who lives in Living Unit 1E indicated he could see into some HSA units. (ECF No. 162, p. 3). That patient could not, however, identify any of those units as Room N104. (ECF No. 162, p. 3).

As a result, the record in a light most favorable to Ivey establishes only that residents of Living Unit 1E can see into certain HSA rooms, but not the one in which Ivey was searched. Any conclusion to the contrary would be based on speculation and conjecture, which this Court may not do in considering a motion for summary judgment. *See Habib v. NationsBank*, 279 F.3d 563, 567 (8th Cir. 2001). Because the evidence in the record establishes the search took place in a room that was out of public view and because Ivey identifies no other reason why the location of the search was improper, this factor also weighs in favor of Dreher and Dahl.

The final factor the Court must consider is the manner in which the search was conducted. Ivey concedes that Dreher and Dahl behaved professionally and appropriately throughout the search itself. (ECF No. 160, p. 13). But he argues that the search was conducted in an unreasonable manner because MSOP used "pain compliance and excessive

force." (*Id.*, p. 11). Ivey's argument is based largely on the fact that MSOP staff refused to remove his handcuffs unless he consented to the search.

Though the use of force can be a factor in determining whether a search was reasonable, courts typically consider the force used during the search itself, rather than the use of force before the search. *See Robinson v. Hawkins*, 937 F.3d 1128, 1137 (8th Cir. 2019) (considering fact that officer grabbed the plaintiff's arms, unfastened her pants, and pulled down her underwear during search). Other courts have considered whether the detention of a person during a search was unreasonable under the Fourth Amendment. In those cases, courts considered factors including the length of time the person was in handcuffs, whether those handcuffs were overly tight, and whether the person complained of pain from the handcuffs. *See, e.g.*, *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003). Ultimately, however, those courts were assessing whether the detention violated a person's Fourth Amendment right to be free from an unreasonable *seizure*. *Id.* Ivey has never pled such a claim against Dreher or Dahl. In fact, he indicated that the sole basis for his Fourth Amendment claim against Dreher and Dahl was the fact that the UVBS was conducted in an undignified manner in a room that lacked privacy. (ECF No. 193-1, p. 151). The Court therefore concludes that the application and maintenance of the handcuffs are relevant to Ivey's excessive force claims, but not his unreasonable search claims.

Furthermore, even if the Court considered the use of handcuffs here, the Court would conclude that they do not establish the search was conducted in an unreasonable manner. Ivey's search was conducted in compliance with MSOP policy, which prohibits

staff from removing restraints from a patient in the HSA until the UVBS is completed.[1] (ECF Nos. 181, p. 3 & 181-1, pp. 5-7). The reason for this is because if staff are required to do a staff assisted UVBS, they must restrain the patient again, which causes an unnecessary safety risk. (ECF No. 181, p. 3). The Court must defer to this judgment unless the record contains "substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security." *Florence*, 566 U.S. at 323. In this case, Ivey's claim that the UVBS could, and should, have been waived in this case, thus allowing him to be removed from handcuffs sooner, fails for the same reasons as the Court discussed regarding his excessive force claims.[2] Ivey has failed to show that Dreher and Dahl should be held liable for any failure to waive the UVBS in this case.

The Court has considered and weighed the *Bell* factors. These factors must be considered together; no one factor is dispositive. *See Byrd v. Maricopa Sheriff's Dep't*, 629 F.3d 1135, 1142 (9th Cir. 2011). On this record, drawing all inferences and disputes in favor of Ivey, the Court concludes that no reasonable jury could find the UVBS violated Ivey's Fourth Amendment rights. The search was conducted with ample justification, as it occurred after Ivey tore up his room and was transferred to the HSA. And though intrusive, the UVBS was conducted in a manner consistent with that previously approved by the Eighth Circuit, in an appropriate location, and at a time when Ivey had a diminished

---

[1] Ivey does not allege that Defendants acted unreasonably by failing to arrange for a staff assisted UVBS sooner, which might have allowed for the earlier removal of his restraints earlier. (*See* ECF No. 181, p. 3 (explaining that restraints may be removed once staff complete the UVBS)).

[2] Ivey does note in his statement of undisputed facts that MSOP used to leave a patient in restraints for up to four hours if a patient did not comply with the UVBS, but that MSOP has since amended that policy so that a patient may spend only one hour in restraints. (ECF No. 163-2, p. 5). Ivey does not, however, cite to any evidence to show this was because MSOP's previous policy was excessive or unjustified. Absent additional evidence, The Court will not speculate as to the reasons why MSOP amended its policy. *See Habib*, 279 F.3d at 567.

expectation of privacy. Accordingly, the Court recommends summary judgment be entered in favor of Dreher and Dahl.

### H. Count Seven – Fourth Amendment Claim as to Gullickson

Ivey also claims that Gullickson violated Ivey's Fourth Amendment rights because though Gullickson did not participate in the UVBS, he told Ivey he needed to comply with it before his restraints would be removed. Both parties seek summary judgment on this claim. Because the Court has concluded the UVBS did not violate Ivey's Fourth Amendment rights, the Court also concludes that Gullickson's ordering Ivey to comply with the UVBS did not violate Ivey's Fourth Amendment rights. Accordingly, the Court recommends that summary judgment be entered on count seven as well.

## III.  RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Partial Motion for Summary Judgment (ECF No. 160) be **GRANTED** to the extent that Ivey requests that Count Three be dismissed with prejudice and **DENIED** in all other respects.

[continued on next page]

2.  Defendants' Motion for Summary Judgment (ECF No. 167) be **GRANTED**, the

matter be **DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.

Date: May 20, 2020                          _____*s/ Tony N. Leung*_____
                                            Tony N. Leung
                                            United States Magistrate Judge
                                            District of Minnesota

                                            *Ivey v. MSOP et al.*
                                            Case No. 12-cv-30 (DWF/TNL)

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).